# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 10, 2023     Decided September 3, 2024

No. 22-3052

UNITED STATES OF AMERICA,
APPELLEE

v.

TERRELL ARMSTEAD, ALSO KNOWN AS RELL, ALSO KNOWN AS
SUPREME 16,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cr-00369-1)

———

*Jonathan Zucker*, appointed by the court, argued the cause and filed the briefs for appellant.

*Mark Hobel*, Assistant U.S. Attorney, argued the cause for appellee.  With him on the brief were *Chrisellen R. Kolb*, *John P. Mannarino*, and *Amy Larson*, Assistant U.S. Attorneys.

Before: KATSAS, PAN, and GARCIA, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:    A jury convicted Terrell Armstead of sex trafficking through coercion but failed to reach a verdict on various other charges.  During jury deliberations, the district court dismissed a juror who had failed to disclose during voir dire that her father had been convicted of prostitution and drug offenses.  Deliberations remained ongoing as the country was shutting down over COVID, so the court then instructed the jury to return any partial verdict it had reached.  Armstead contends that the court impermissibly dismissed the juror and demanded the partial verdict.

We reject both contentions.  The district court permissibly dismissed the juror for her lack of candor during voir dire—misconduct that was apparent from the record and unrelated to how the juror may have viewed the evidence.  Moreover, although the Sixth Amendment prohibits judges from coercing juries to reach criminal verdicts, a judge retains discretion to require the return of a partial verdict that the jury has reached voluntarily.  Here, with COVID making future deliberations impossible, the district court did not abuse that discretion.

I

Armstead enticed vulnerable women to become prostitutes, including one known here as "O.S."  Armstead put O.S. to work propositioning customers in a strip club.  He branded her with a tattoo of his street name, forced her to give him any money that she received, and held her car keys and social-security card to prevent her from leaving him.  Armstead hit O.S., choked her, and threatened her with firearms.

A grand jury indicted Armstead on seven counts relating to sex trafficking and one count of obstruction.  Count Two of the indictment charged him with trafficking O.S. through force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a) & (b)(1).

3

The district court asked prospective jurors whether any of them—or their close relatives or friends—had been a victim of a crime, a witness to a crime, or "arrested for, convicted of, or charged with a crime." S.A. 8. Juror 10 answered no, but this raised eyebrows. Defense counsel pressed her on whether she really did not know anyone charged with a crime, or the victim of a crime, despite having lived in Washington, D.C. for 53 years. She remained firm in her answer and was eventually seated on the jury.

During the second day of jury deliberations, Juror 10 asked the courtroom deputy what she could do if she did not "want to be on this jury" anymore. S.A. 24. The district court then probed whether she could continue to deliberate in good faith. In response, Juror 10 revealed that her father had been convicted on federal "prostitution and drug[]" charges, in what she described as a "very high-profile case." *Id.* at 30. She explained that she had "thought this would be a good case" for her to sit on, because she could "look outside the box." *Id.* But after deliberations started, she was "not comfortable" doing so any longer. *Id.* at 31.

The government filed a motion to remove Juror 10 under Federal Rule of Criminal Procedure 23(b). That rule sets the default number of jurors at twelve but allows the parties to consent to a smaller jury. Fed. R. Crim. P. 23(b)(1) & (2). If a jury of twelve begins deliberating, the rule also permits the court to remove one juror for "good cause" and to take a verdict from the remaining eleven jurors. *Id.* 23(b)(3). Armstead opposed removal of Juror 10. He argued that, because her revelations were bound up in her view of the evidence, removing her would compromise his Sixth Amendment right to a unanimous verdict.

The district court found good cause to dismiss Juror 10 based on her lack of candor during voir dire. The court noted "five instances at least" where she had been asked about

4

relatives with criminal records and not disclosed her father's convictions. S.A. 66–67. The court noted that this "suggests a lack of candor, and there's evidence to point towards something more." *Id.* at 67. But the court declined to determine whether the juror had intentionally concealed information to mislead the court, how the juror might view the case, or whether she was a holdout during the ongoing deliberations. Instead of forcing deliberations to start anew by recalling the alternate juror, the court instructed the remaining eleven jurors to continue deliberating.

The COVID pandemic rapidly spread as they did. On the fifth day of deliberations, Friday, March 13, 2020, our courthouse closed to the public. Also, the foreman informed the district court that her child's school had cancelled classes for the upcoming week, which required her to find childcare. During this conversation, the court asked her whether the jury had reached "a unanimous verdict as to any of the counts." S.A. 127. She answered yes but did not give any more details. Armstead and the government agreed to remind the jury that it could return a verdict on any count, even if it had not reached a verdict on all of them. The court gave the instruction in the late afternoon, then the jury deliberated for some twenty more minutes before calling it a day.

Things worsened over the weekend. The foreman's babysitter for Monday cancelled, leaving her without childcare and afraid to expose her son to the pandemic. Armstead sought a mistrial on the ground the jury could neither deliberate nor render a verdict with one of eleven members participating remotely. The district court agreed that the jury could not deliberate remotely for practical reasons, but concluded that it could remotely render a verdict. And it decided to ask the jury to render any partial verdict it had reached. The court instructed the jury:

5

[L]et us know if you have received – reached a verdict of guilty or not guilty with respect to any count. If you have, what I am going to ask you to do is to complete your verdict form and tell us what that verdict is. Now, again, that is an "if." If you have not reached a verdict as to any particular count, I'm going to ask you to simply say "no verdict" on the verdict form, okay? So you'll have your verdict form. As to any particular count, if you have reached a verdict, simply indicate what that verdict is. If you have not reached a verdict as to a particular count, simply indicate on the verdict form "no verdict," okay?

…

Now, as I said, if and only if you have reached a verdict as to any particular count, should you so indicate. I'm not asking you to come to a conclusion if you have not.

S.A. 163–64 (cleaned up). The jury then returned a guilty verdict on Count Two—sex trafficking O.S. through force, fraud, or coercion—and no verdict on the remaining seven counts. Armstead requested a poll, which confirmed that the jury was unanimous on the count of conviction.

After the government dropped the outstanding charges, the court sentenced Armstead to 276 months in prison, followed by 240 months of supervised release.

II

On appeal, Armstead challenges both the removal of Juror 10 during deliberations and the instruction asking the jury to return any partial verdict it had reached. This Court reviews both decisions for an abuse of discretion. *See United States v. McGill*, 815 F.3d 846, 867 (D.C. Cir. 2016) (per curiam);

6

*United States v. Stover*, 329 F.3d 859, 864 (D.C. Cir. 2003) (per curiam).  Under this standard, we consider only whether the district court acted unreasonably or made a legal error.  *See United States v. Jenkins*, 50 F.4th 1185, 1195 (D.C. Cir. 2022); *United States v. Volvo Powertrain Corp.*, 758 F.3d 330, 345 (D.C. Cir. 2014).

A

Armstead's challenge to the removal of Juror 10 implicates both Federal Rule of Criminal Procedure 23(b)(3) and the Sixth Amendment.

1

Rule 23(b)(3) provides:  "After the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror."  A "variety of issues" can support a finding of good cause under this rule, "including illness, family emergency, or … jury misconduct."  *McGill*, 815 F.3d at 866.  Misconduct "consists of actions by jurors that [are] contrary to their responsibilities," including "giving false testimony during voir dire."  *Id.* at 866–67 (cleaned up).  Other courts have confirmed the latter point.  For example, in *United States v. Ozomaro*, 44 F.4th 538 (6th Cir. 2022), the Sixth Circuit affirmed the dismissal of a deliberating juror for "lack of candor" during voir dire.  *Id.* at 544.  And in *United States v. Delva*, 858 F.3d 135 (2d Cir. 2017), the Second Circuit affirmed the dismissal of a deliberating juror for "lying on voir dire."  *Id.* at 157–59.

The district court had ample basis for concluding that Juror 10 did not candidly respond to questions in voir dire.  As the court explained, there were "five instances at least" where she answered no to the question whether she had any relatives with criminal convictions.  S.A. 66–67.  The relative in question was her father, and the convictions in question were for

7

"prostitution and drugs," in a federal case that she described as "very high-profile." *Id.* at 30. Moreover, she did not answer no merely once or twice, without time to recollect. And after her change of heart about participating on the jury, she all but admitted to withholding information in order to be seated. Specifically, she told the district court that she had thought this would be a "good case" for her to sit on, because her personal experience would enable her to "look outside the box." *Id.*

Armstead objects that the district court did not make a specific factual finding on whether Juror 10's repeated false denials were willful or inadvertent. To be sure, the court generously distinguished between the juror's "lack of candor" and her "possibly intentionally misleading the Court and the parties," in part to avoid what it recognized as "Fifth Amendment concerns at this point." S.A. at 62–63. But the court did find "certainly, at a minimum" that Juror 10 had shown "a lack of candor." *Id.* at 67. In ordinary usage, that phrase denotes some degree of dishonesty. *See, e.g.*, *United States v. Vinton*, 594 F.3d 14, 23 (D.C. Cir. 2010) ("lack of candor" evinces "malicious purposes"). Moreover, the record summarized above, and the court's extensive recounting of its concerns, make clear that the dismissal was not based on a merely innocent failure of recollection.

2

The Sixth Amendment guarantees criminal defendants the right to a "trial, by an impartial jury." Construing this text against "the common law, state practices in the founding era, [and] opinions and treatises written soon afterward," the Supreme Court has held that a jury "must reach a unanimous verdict in order to convict." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020). This unanimity requirement "constrains" a good-cause determination under Rule 23(b)(3). *United States v. Wilkerson*, 966 F.3d 828, 834 (D.C. Cir. 2020). In particular, a district court may not dismiss a deliberating juror "if the

8

request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence." *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987).

After *Brown*, this Court repeatedly has held that a district court may dismiss a deliberating juror for reasons "independent" of the juror's possible views of the evidence. *See McGill*, 815 F.3d at 868. In *United States v. Ginyard*, 444 F.3d 648 (D.C. Cir. 2006), we reasoned that a deliberating juror could be dismissed for an "employment-related need," despite reasons for believing that the juror was skeptical of the government's evidence. *Id.* at 652. In *McGill*, we held that a deliberating juror could be dismissed for sneaking notes outside the jury room, 815 F.3d at 869–70, even if the juror was apparently a holdout for the defense, *see id.* at 862–66. And in *Wilkerson*, we upheld a dismissal where the juror had indicated strong disagreement not with the sufficiency of the government's proof, but with the law governing the case. 966 F.3d at 835–36.

The dismissal of Juror 10 was permissible under these precedents. The district court reserved the question whether Juror 10 wished to be removed based on her assessment of the evidence or her possible status as a holdout. S.A. 57–58. And it found good cause based entirely on her untrue statements during voir dire. This case is like *McGill* insofar as the good cause exists "independent of" the juror's possible views of the case. *See* 815 F.3d at 867–68. But in one respect, this case is even easier—here, the misconduct occurred *before* the juror heard any evidence. By the end of voir dire, there was good cause to justify excusing the juror, even though it was not discovered until after deliberations had begun.

Armstead reads our precedent differently. According to him, a juror cannot be dismissed if her misconduct is related in any way to her reluctance to convict—even if the misconduct is by itself enough to constitute good cause. Armstead's theory

9

would make it all but impossible to remove jurors for lying during voir dire, where questions are asked precisely to discover possible biases or leanings that may color jurors' view of the case. But the misconduct justifying removal is a juror's withholding of information during voir dire, not the juror's possible biases or leanings in the case. And this lack of candor—which occurs before the juror has heard any evidence—is distinct from any possible "evidence-based inclination to acquit," *McGill*, 815 F.3d at 869, even if the underlying subject of the voir dire testimony may affect the juror's good-faith view of guilt or innocence. For these reasons, we agree with our sister circuits that a deliberating juror may be removed for lack of candor during voir dire. *See Ozomaro*, 44 F.4th at 544; *Delva*, 858 F.3d at 157–59.

3

Alternatively, Armstead complains that the district court did not adequately probe Juror 10's motivation during voir dire. As Armstead himself recognizes, probing too much about why a juror wants to be dismissed risks improperly intruding on the confidentiality of deliberations. *See Wilkerson*, 966 F.3d at 835–36. And Armstead did not ask the district court to probe further when it proposed to dismiss the juror for lack of candor. In any event, as explained above, the misconduct here turned not on why Juror 10 might have wanted to be excused during deliberations, but on whether her answers during voir dire lacked candor. On that point, the record speaks for itself, and the district court explained in detail the compelling evidence that the juror did not answer questions candidly.

B

Armstead further contends that the district court abused its discretion in asking the jury to return whatever partial verdict it had reached when further deliberations became impossible. He contends that the instruction impermissibly interfered with

10

the jury's deliberative process.  Armstead does not identify any source of positive law for this claim, but we think it must be the Sixth Amendment.[1]

1

The Sixth Amendment guarantees a "trial, by an impartial jury," and history shows that this requires a "unanimous verdict in order to convict." *Ramos*, 140 S. Ct. at 1395.  So, the judge may not coerce or pressure the jury—or any individual juror—into voting to convict.  We have developed this point in cases addressing how judges may respond to announced jury deadlocks.  "When efforts to secure a verdict from the jury reach the point that a single juror may be coerced into surrendering views conscientiously entertained, the jury's province is invaded and the requirement of unanimity is diluted." *United States v. Thomas*, 449 F.2d 1177, 1181 (D.C. Cir. 1971) (en banc).  And an instruction is impermissibly coercive if it "shows a substantial propensity for prying individual jurors from beliefs they honestly have." *United States v. Driscoll*, 984 F.3d 103, 114 (D.C. Cir. 2021) (cleaned up).  The same principles govern whether judges may ask for partial verdicts, which likewise may coerce juries into surrendering conscientiously held views for the sake of reaching a verdict.  But in both contexts, "neutral" comments—ones that do not pressure jurors "to yield a conscientious

---

[1] As explained above, Rule 23(b)(3) addresses the size of a jury and when a deliberating juror may be dismissed.  It says nothing about how a jury may or must deliberate.  Rule 31(b)(2) states that, "[i]f the jury cannot agree on all counts as to any defendant, the jury may return a verdict on those counts on which it has agreed."  This rule entitles a jury to return a partial verdict, but does not speak to when the court may prod it to do so.

11

conviction"—are generally permissible. *United States v. McKinney*, 822 F.2d 946, 950 (10th Cir. 1987).

Nothing in the instruction here pressured the jury to reach a verdict, much less to find Armstead guilty. Indeed, it is hard to imagine a less coercive instruction. The district court required the jury to report any "verdict of guilty or not guilty" on any individual count—without suggesting a preference for one outcome over the other. S.A. 163. Repeating the word *if* nine times, the court further instructed the jury to report any partial verdict "if" it had reached one and to report the absence of a verdict "if" not. *Id.* at 163–64. Here is one example: "Now, again, that is an 'if.' If you have not reached a verdict as to any particular count, I'm going to ask you to simply say 'no verdict' on the verdict form." *Id.* at 163. Here is another: "If you have not reached a verdict as to a particular count, simply indicate on the verdict form 'no verdict.'" *Id.* at 164. Here is a third: "[I]f and only if you have reached a verdict as to any particular count, should you so indicate. I'm not asking you to come to a conclusion if you have not." *Id.* Given the clear and easy choice between returning a verdict or simply reporting "no verdict," even Armstead acknowledges that the instruction "did not use coercive language" to pressure a verdict. Appellant's Reply Br. at 12.

This case looks nothing like a typical case of jury coercion. In deadlock cases, for instance, an aggressive instruction to continue deliberating may suggest that holdout jurors should abandon their honestly held positions. *See*, *e.g.*, *Driscoll*, 984 F.3d at 110–11; *United States v. Black*, 843 F.2d 1456, 1463–64 (D.C. Cir. 1988). But the instruction here did not seek to direct future deliberations at all. Instead, it simply asked the jury to report any partial verdict it had already reached, while simultaneously prohibiting them from reporting a verdict unless they had already reached one. Nothing in the instruction

12

pressured any juror to abandon conscientiously held views about the case.

2

With no colorable argument of coercion, Armstead must instead urge a bright-line rule: Forcing the jury to return a verdict that it has already reached impermissibly intrudes on the jury's deliberative process. But the Sixth Amendment, in guaranteeing trial by an impartial jury, says nothing about the timing or structure of deliberations through which jurors reach their honestly held positions. And the ostensible right of a jury to structure its deliberations has no deep historical pedigree. To the contrary, legislatures and judges have long played a role in structuring how juries deliberate.

Start with the judge's authority to require more deliberations after the jury announces a deadlock. Even when a jury declares itself to be "hopelessly deadlocked," the court may order it to continue, so long as the order does not coerce jurors into surrendering their beliefs. *See*, *e.g.*, *Black*, 843 F.2d at 1463; *Fulwood v. United States*, 369 F.2d 960, 961–63 (D.C. Cir. 1966). Such an order surely impacts the deliberative process; the jury wishes to stop deliberating, but the court makes it continue to avoid a mistrial if possible. Yet we have repeatedly held that such instructions do not violate the Sixth Amendment as long as they are noncoercive. *See*, *e.g.*, *Driscoll*, 984 F.3d at 113; *United States v. Lloyd*, 515 F.3d 1297, 1302–03 (D.C. Cir. 2008).

Courts structure jury deliberations in other ways as well. For example, when a defendant is charged with greater and lesser-included offenses, some states require the jury to resolve the charges in descending order of severity, acquitting on the greater offense before considering the lesser. *See*, *e.g.*, *People v. Richardson*, 184 P.3d 755, 764 n.7 (Colo. 2008) (en banc); *Hughes v. State,* 66 S.W.3d 645, 651 (Ark. 2022). This

13

practice has deep roots, and it clearly involves structuring of the jury's deliberations. More precisely, it "'requires the jury to reach a partial verdict' on the greater offenses first." *Richardson*, 184 P.3d at 764 n.7 (quoting *State v. Tate*, 773 A.2d 308, 321 (Conn. 2001)). Yet as Judge Friendly concluded nearly a half-century ago, such an "acquittal-first" system is not "wrong as a matter of law." *United States v. Tsansas*, 572 F.2d 340, 346 (2d Cir. 1978). Indeed, we are aware of no authority holding that this longstanding and widespread practice violates the Sixth Amendment.

Armstead's argument also finds no support in founding-era common law, state practices, judicial opinions, or treatises. If it did violate the Sixth Amendment for judges to structure jury deliberations even without coercion, one might expect to see some discussion of this point in these historical sources. *See Ramos*, 140 S. Ct. at 1395. Yet Armstead fails to cite a single historical source for his position, and we have not found one either. To the contrary, founding-era common law cuts against Armstead's position. William Blackstone, "the preeminent authority on English law for the founding generation," *Alden v. Maine*, 527 U.S. 706, 715 (1999), observed that judges could deny the jury "meat, drink, fire, or candle" in order to "accelerat[e] unanimity" and thus avoid "causeless delay." 3 W. Blackstone, Commentaries on the Laws of England 375 (1769). We do not suggest that coercing verdicts in this way would be permissible under modern standards barring the coercion of a verdict. *See Jenkins v. United States*, 380 U.S. 445, 445–46 (1965) (per curiam). Nonetheless, it is striking just how dramatically Armstead's proposed rule diverges from founding-era practices and understandings.

3

With text and history cutting against him, Armstead invokes caselaw from other jurisdictions. But far

14

from establishing that courts may never ask juries to return partial verdicts voluntarily reached, it supports the opposite point:  Courts retain discretion to consider doing so.  For example, in *United States v. Heriot*, 496 F.3d 601 (6th Cir. 2007), the Sixth Circuit affirmed a decision to require the jury to return partial verdicts it had already reached.  *See id.* at 606–08.  The court stressed the "delicacy" of the decision to do so, which it reviewed only "for abuse of discretion." *Id.* at 608.  It acknowledged a risk that accepting a partial verdict sometimes might improperly force the jury to truncate deliberations prematurely, but it found no reason to think this had actually occurred in the case at bar.  *See id.*  Likewise, in *McKinney*, the Tenth Circuit affirmed a decision to require the jury to return any partial verdicts it had reached by a time certain.  *See* 822 F.2d at 950.  In doing so, the court stressed that the instruction was "neutral" as to whether the jury should reach any verdict, by confirming "that no individual juror was ever required to yield a conscientious conviction" to return a verdict.  *See id.*

Armstead counters with *United States v. Moore*, 763 F.3d 900 (7th Cir. 2014), and *United States v. Benedict*, 95 F.3d 17 (8th Cir. 1996), which reversed decisions to require the return of partial verdicts.  But both cases recognized the "discretionary and fact-dependent" nature of that question. *Moore*, 763 F.3d at 910; *see Benedict*, 95 F.3d at 19 ("partial verdicts may be appropriate in certain circumstances").  In *Moore*, the district court ordered the partial verdict on the first day of deliberations, over the objection of both parties; and the jury, forced to decide the case piecemeal, ended up rendering an inconsistent verdict.  *See* 763 F.3d at 904–08.  Likewise, in *Benedict*, the district court ordered the partial verdict less than a full day into deliberations, over the objection of the jury itself, which was grappling with two closely interrelated counts.  *See* 95 F.3d at 18 (jury had "indicated that they were making progress and asked to continue deliberating").  At bottom, both cases rest on concerns about "the premature conversion of a tentative jury vote into an irrevocable one," before the jury has

15

had an "opportunity to fully consider the evidence." *Id.* at 19; *see Moore*, 763 F.3d at 912–13 (same).

This case involves nothing like those two. Here, the jury had deliberated for five days; it expressed no wish to continue deliberating; and the emerging pandemic made any further deliberations impossible. In short, there were no more deliberations that the district court could have "cut short." *See Moore*, 763 F.3d at 913 (cleaned up). So the court sensibly asked the jury to turn in whatever verdict it had already reached, if any, while making it perfectly clear that the jury had no duty at all to reach such a verdict in the first place.

Armstead's reliance on *United States v. Taylor*, 507 F.2d 166 (5th Cir. 1975), is even more misplaced. There, a juror died after the jury had voted among themselves but before any verdict was announced in open court. *Id.* at 167. The remaining eleven jurors announced in open court their votes to convict, and they revealed that the deceased juror had also voted the same way in the jury room. *Id.* The Fifth Circuit held that no "verdict was returned" from the vote in the jury room, because a "jury has not reached a valid verdict" until the decision is announced "in open court." *Id.* at 168–69. And the remaining eleven jurors could not render such a verdict because, at the time, Rule 23 required a twelve-member jury. *Id.* at 169. But a valid resolution of Count Two exists here, where the requisite number of jurors unanimously returned a guilty verdict in open court and then confirmed it in a jury poll. *Taylor*, which turned on the obvious point that votes taken in the jury room do not finally resolve anything, has nothing to say about the partial verdict announced in this case in open court.[2]

---

[2] Armstead further contends that once the foreman could no longer deliberate, the district court had no choice but to declare a mistrial. This argument rests entirely on the premise that the court

16

III

We affirm the judgment of the district court.

*So ordered.*

---

could not request the partial verdict, which fails for the reasons we have given.